IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **DIANE L. ESTES,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil No. **05-741-DRH** |
| | ) |
| **HEALTH VENTURES of** | ) |
| **SOUTHERN ILLINOIS,** | ) |
| | ) |
| Defendant. | ) |

## ORDER

**PROUD, Magistrate Judge:**

Before the court are two motions concerning defendant's assertion of attorney-client privilege. The motions are Defendant's Motion for Protective Order **(Doc. 23)** and Plaintiff's Motion to Strike Defendant's Assertion of Attorney Client Privilege **(Docs. 28 and 36)**.

Plaintiff is suing her former employer for damages pursuant to Title VII. She alleges that she was fired in retaliation for making complaints about sexual harassment and sex discrimination. In paragraph 10 of her amended complaint, she alleges that the decision maker, Ed Hughes, represented to her that her position was being eliminated, but that, prior to her termination, Hughes had asked defendant's attorney "how long defendant would have to wait before replacing plaintiff." **Doc. 9, ¶10.**

The motions present the issue of whether the alleged conversation between Hughes and the attorney is protected by the attorney-client privilege. Because plaintiff's case is governed by federal law, the application of the privilege is governed by federal law. **Fed.R.Evid. 501.**

As is explained in defendant's memorandum in support of its motion for protective order,

1

defendant admits that Hughes conferred with Tri-Lab's outside counsel, Gary Smith, before plaintiff was fired. However, defendant contends that plaintiff's description of the conversation is inaccurate. For purposes of these motions, the court will assume that plaintiff's rendition of the conversation is correct

According to defendant, Hughes conferred with the attorney about eliminating plaintiff's position pursuant to the direction of Tri-Lab's Operations Committee. Attached to **Doc. 24** as **Exhibit C** is a copy of committee meeting minutes, dated May 13, 2004, which reflect that the committee approved Hughes' suggestion that the positions of Human Resources Director and Core Laboratory Manager (plaintiff's position) be eliminated. The minutes state that Hughes "was directed to communicate with Tri-Lab's lawyers in finalizing this decision." Plaintiff was fired on June 8, 2004.

The parties agree that Hughes, who is the Executive Director of Tri-Lab, and attorney Smith discussed the termination of plaintiff's employment in front of Lynn Byrd, who was then the Chief Financial Officer of the company.

The conversation with counsel was disclosed by Byrd in an e-mail dated June 10, 2005. **Doc. 24, Exhibit T**. At that time, Byrd was no longer employed by defendant. Byrd himself was fired on April 4, 2005. According to defendant, Byrd's position was also eliminated. **Doc. 24, p. 4**. Byrd disagrees; Byrd is suing defendant in Madison County, Illinois, for wrongful termination. **Doc. 24, p. 10, footnote 16.**

The e-mail disclosing the conversation was sent by Byrd to Kathy Wilson, another former Tri-Lab employee. Wilson forwarded the e-mail to plaintiff on June 11, 2005. **Doc. 24, Ex. H.** Plaintiff agrees that she learned of the conversation with the attorney from the June 11,

2

2005, e-mail.  **Doc. 29, pp. 1-2.**

Byrd harbored animosity toward defendant at the time he disclosed the communication with counsel.  Defendant has attached various e-mails purportedly written by Mr. Byrd in which he expresses negative feelings towards defendant and Mr. Hughes.  **See, Doc. 24, Exhibits L through T**.  The earliest of the messages was dated in September, 2004.  All of these e-mails except for one were addressed to Kathy Wilson, the former human resources director of Tri-Labs.  Ms. Wilson has also been terminated by defendant.  There is no suggestion that either Byrd or Wilson were authorized by defendant to waive the attorney-client privilege.

Byrd was interviewed by the EEOC during its investigation of plaintiff's complaint.  The EEOC file contains notes of the interview, a copy of which is attached to **Doc. 24 as Exhibit G.**  The EEOC notes are not dated, but it is evident that the interview took place after Byrd was terminated.  Byrd told the EEOC officer about the conversation between Hughes and the attorney.

The attorney-client privilege is "one of the oldest recognized privileges for confidential communications."  Its purpose is to encourage "full and frank communication" between client and counsel, which, in turn, promotes "broader public interests in the observance of law and the administration of justice."  ***Swidler & Berlin v. U.S.*, 524 U.S. 399, 403, 118 S.Ct. 2081, 2084 (1998) [internal citation omitted].**

The party invoking the attorney-client privilege must show the following:

1) legal advice was sought;

2) from a professional legal advisor in his capacity as such;

3) the communication related to that purpose;

4) the communication was made in confidence;

5) the communication was made by the client to the legal advisor or by the legal advisor to the client; and

6) the client has not waived the privilege.

***United States v. Evans*, 113 F.3d 1457, 1461 (7th Cir. 1997).**

Business entities such as defendant can claim the protection of the attorney client privilege. ***Commodity Futures Trading Commission v. Weintraub*, 471, U.S. 343, 348, 105 S.Ct. 1986 (1985).**

Defendant has attached the affidavit of Mr. Hughes in which he states that the Operations Committee instructed him to consult with defendant's attorney about eliminating the positions held by plaintiff and Wilson. He states that he spoke with attorney Smith pursuant to those instructions, and that he "intended and understood that [his] communications with Smith were, and would remain, confidential attorney-client communications." He also states that he expected that Mr. Byrd would treat the conversation as confidential and that he never authorized Byrd to disclose the communications. **Doc. 24, Exhibit F, ¶4**.

Plaintiff does not seriously dispute that the attorney client privilege attached to the conversation. She briefly argues that the conversation was not privileged because it took place in front of Byrd whom, she asserts, was not a member of the "control group." **Doc. 29, p. 4.** Plaintiff does not flesh this argument out, and the court need not spend much time on it either. The "control group" test was rejected in ***Upjohn Co. v. United States*, 449 U.S. 383, 396-397, 101 S.Ct. 677, 696 (1981)**. In fact, the Supreme Court observed that the control group test "frustrates the very purpose of the privilege by discouraging the communication of relevant

information by employees of the client to attorneys seeking to render legal advice to the client corporation." **Upjohn, 449 U.S. at 392, 101 S.Ct. at 684.**

Plaintiff's real argument, as revealed in her motion to strike, is that the privilege was waived in some manner.

Plaintiff briefly suggests that, if Mr. Byrd was a "high-ranking" employee, he had the inherent authority to waive the privilege. The glaring fault in this argument is that, of course, Byrd was no longer employed by defendant when he wrote the e-mail which revealed the conversation. Because he was no longer employed by defendant, he had no authority to waive the attorney client privilege against defendant's wishes. **See, *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 349, 105 S.Ct. 1986, 1991 (1985)**.

The court also rejects plaintiff's argument that the crime/fraud exception as discussed in *Petition of Sawyer*, **229 F.2d 805 (7th Cir. 1956)**, is applicable. Plaintiff suggests that Byrd's e-mail establishes that Hughes was consulting with counsel as how to perpetrate a fraud, i.e., he wanted to tell plaintiff that she was being fired because her position was being eliminated, but, in reality, he wanted to replace her.

According to the June 10, 2005, e-mail, Hughes asked the attorney "how long he had to wait before filling the position." The attorney asked "Is this really an elimination of the position or something else?" Hughes did not answer that question. The attorney told him that "there was nothing in the law specifying a date it would up to a judge or jury to interpret." **Exh. T**. Assuming that this rendition of the conversation is accurate, it is difficult to see how this constitutes seeking advice on how to perpetrate a fraud.

Plaintiff offers no authority for the proposition that this situation constitutes "fraud"

5

within the meaning of the crime/fraud exception. The court's independent research has not located any such authority. Seventh Circuit cases construing the crime/fraud exception involve very different scenarios. In *Sawyer*, cited by plaintiff, the client communicated to the attorney the fact that, if charges against him were dropped, he was willing to testify falsely that another person had given him a bribe. **229 F.2d at 807-808.** Other topics held to fall within the crime/fraud exception are filing false reports with the state elections board to conceal improper campaign contributions, *In re Special September 1978 Grand Jury (II)*, **640 F.2d 49 (7th Cir. 1980)**; engaging in securities and mail fraud, *U.S. v. Aldridge*, **484 F.2d 655 (7th Cir. 1973)**; and obstructing justice by hiding documents subpoenaed by a grand jury, *Matter of Feldberg*, **862 F.2d 622, (7th Cir. 1988).**

In *Feldberg*, the Seventh Circuit stated that there must be a prima facie showing that a crime or fraud has occurred in order to overcome the privilege. Here, there has been no such showing. Plaintiff has shown only that Hughes sought legal advice about when plaintiff could be replaced. (There is no "independent evidence" requirement; i.e., the allegedly privileged communication may be used to establish that the crime-fraud exception applies. **See,** *U.S. v. Zolin*, **491 U.S. 554, 574, 109 S.Ct. 2619, 2632 (1989).**) This is no more sinister that seeking legal advice on any personnel question. See, *Rehling v. City of Chicago*, **207 F.3d 1009 (7th Cir. 2000)**, in which the Seventh Circuit held that, in a case under the ADA, communication with counsel regarding the placement of plaintiff and the employer's obligations under the ADA was protected by attorney-client privilege.

Without more, firing plaintiff so that someone else could be hired in her place would not be illegal. Similarly, lying to her about why she was fired, if that indeed happened, would not be

6

fraudulent. In fact, according to defendant, she has not been replaced. Rather, her duties have been assumed by existing employees.

Plaintiff also argues that defendant waived the privilege by putting its good faith in issue in its affirmative defenses, citing **Lorenz v. Valley Forge Ins. Co.**, **815 F.2d 1095, 1098 (7th Cir. 1987)**. In that case, the Seventh Circuit stated "To waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations. The holder must inject a new factual or legal issue into the case. Most often, this occurs through the use of an affirmative defense." **Lorenz, 815 F.2d at 1098.** Here, it was *plaintiff* who injected the issue into the case by pleading in her original and amended complaints that Hughes asked defendant's attorney how long defendant would have to wait to replace plaintiff. **See, Doc. 1, ¶10; Doc. 9, ¶10**.

In its answers to the original and amended complaints, defendant denied the allegations of paragraph 10 and invoked the attorney-client privilege. It is true that defendant has asserted in paragraph 21 that it "has an effective policy prohibiting retaliation in the workplace and made good faith efforts to comply with federal and state anti-retaliation laws." This affirmative defense does not waive the attorney-client privilege as to the conversation between Hughes and counsel.

Lastly, plaintiff argues that defendant waived the privilege by voluntarily revealing the information. According to plaintiff, defendant "voluntarily" revealed the conversation by producing the EEOC file to plaintiff in the course of this litigation. That argument ignores the fact that defendant has raised the privilege at every juncture, and that plaintiff's counsel agreed in an e-mail dated April 25, 2006, that "I can stipulate and agree that nothing said or done by you

7

or your client—short of explicit written waiver or explicit waiver on the record during a deposition or court hearing—should be inferred as an intent by defendant to waive your continued assertion of attorney-client privilege" **Doc. 24, Exhibit A**.

The disputed information appears in the EEOC file because the conversation with counsel was disclosed by an unhappy former employee (Byrd) who was not authorized by defendant to waive the privilege. Production by defendant of the EEOC file in discovery was not a voluntary disclosure of the information.

For the foregoing reasons, the court rules that the conversation between Ed Hughes and attorney Gary Smith is protected by the attorney-client privilege. Therefore, Plaintiff's Motions to Strike Defendant's Assertion of Attorney Client Privilege **(Docs. 28 and 36)** are **DENIED**. Defendant's Motion for Protective Order **(Doc. 23)** is **GRANTED as follows:**

Plaintiff is prohibited from taking deposition testimony or engaging in any other discovery regarding or inquiring into the alleged conversation between Hughes and Smith.

**IT IS SO ORDERED.**

**DATE: November 3, 2006.**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
